Next case on this morning's docket is the case of Matthew Bruntjen v. Bethalto Pizza, DBA Nemo's Pizza, Nemo's Franchising Team. We have Mr. Ted McDonald for one of the appellants, and we have Mr. Russell Scott for another appellant, and we have Mr. Roy Drips for the appellee. Now, I understand you two gentlemen have divided your time, and we'll keep record of that. And, Mr. McDonald, you're going to take ten minutes and five minutes rebuttal, is that correct? That's correct. Okay, so you may proceed when you're prepared to.  Good morning. There are several issues raised in the brief of the appellants, briefs of the appellants, many of which support reversal of this case. It ought to be sent back to the circuit court for a retrial. But there's one issue that I want to address with you this morning. That issue goes to the heart of the jury system at the state court. That is whether a plaintiff can buy peremptory challenges from a defender to settle the case. That's the issue I want to address, because that's what happens here. The judge, beginning before Dyer, properly allocated eight peremptory challenges to each side. Four defendant parties essentially on one side and, of course, one plaintiff on the other. So that was appropriate. You have three additional challenges to file, eight on each side. What the plaintiffs did in this case is they entered into a settlement agreement, an agreement with two of the defendants to be dismissed from the case, and that those settling defendants would essentially settle their peremptory challenges for the plaintiff. The plaintiff, therefore, wound up with 12. The defense wound up with 12. That violates 2-1106, the equalization statute that requires that there be the same- This was before the trial, right? Pardon me? That was before the trial. Well, the question is, that's an interesting question. When did that occur? Okay? Now, what's interesting is in the court below, there was never a clear indication from the plaintiffs that they had made such a deal. I don't ever see an admission that they made such a deal in the briefing in this case and below. You're going to tell us how practically it happened then? I'm going to tell you exactly how it happened. Okay, good. Okay? That's a good question. I'm going to tell you how it happened. What happened is, is they didn't maintain in their brief that after the jury was picked, at the end of that first day, jury's picked. And then Mr. Craney, the counsel for Betelgeuse Pizza, said, is anybody- I mean, who's here? Are the parties being dismissed? Right? The plaintiffs said, well, we're going to talk about that in a minute. As if there was no deal. They actually point to that in their briefs to suggest that there was no deal yet. Even after jury was picked. We know there was a deal. There had to have been a deal. The transcript reflects that. How? Well, before the very first- before the beginning of the court diary, Mr. Wendler, an attorney for one of the seven defendants, Metro Distribution, actually sort of raised this issue of, like, I may be using challenges that I might not ordinarily make because I may need to work in accord with the plaintiff. There was an objection at that time. What's going on? There was no disclosure. I'm sorry. Now, who- how did- Mr.- How did he say that? He said it to the court? He said it to the court. After Mr. Wendler- Mr. Wendler said that on the record to the court. How did it come up? Just kind of- Just sort of spontaneously announced. I don't know whether it was conscious, dictated. I need to sort of say something about what's going on here. But they never disclosed that, in fact, a deal had been made. All right? Now, they suggest, well, no deal had been made yet, and we were uncertain as to who would be dismissed. All right? What happened is, then, they go through board dialogue. And when the panel, first panel, is tendered, all right, it's tendered. They- plaintiffs knock off a couple. And then it goes to the defense, panel four. There's a miracle crankle on that panel, juror number nine. And when it goes to the defense for Mr. Wendler, all right, plaintiff's counsel says nine. I mean, there wasn't even a pull the ear, you know, let's bunt, whatever it is, hit the run. It says nine. John Wendler says, we'll strike juror number nine. All right? Juror number nine is Marilyn Branko, who was a poster child for a defense-minded juror. All right? This woman had suggested that she was the head of the ER room at St. Joe's, that she worked for or went to work for an insurance company, that she then had worked for claims department of a water- of the water department, and that she had been a super forward. All right? The automobile case. All right? That's the number one person that was going to take a hit. John Wendler never, never takes that person off the jury. All right? The second one- Was there a- did the other defendant object that at that time? Was there an objection? There was a- you know, there was an objection to what's going on here. Okay? And- On the record. On the record. The judge said- in fact, Judge Matosian has said, well, defendants do that all the time. That's what he said. All right? That's done all the time. I've never heard that being done. The transfer of a peremptory challenge. Never heard that being done. All right? Are you saying among the defendants who've been allocated two peremptories a week- Two, two, two. Right. Are you telling me that the defendants don't discuss among themselves in cases normally- Absolutely. The statute provides for that. Well, I mean, no question about that. No question. In fact, they have to. Sure. Sure. They have to do that because the statute says if the defendants cannot agree to the allocation, the court shall do that. But- Well, I don't know that they have to. But, I mean, you'll hear the court set the allocation. But it's very common for the defendants among themselves to talk about the jurors. Right. The point is- the point is, of course, that's true. When you look at- when you look at the strikes that were made- Okay? It's literally when was told who to take. All right? The second one he takes, Mr. Belosimo, went to high school with a pizza delivery driver. Okay? You know what I'm saying? When was that taken? That's right. Mr. Locke, who takes- uses two for the plaintiffs, essentially, takes two jurors off whom the plaintiffs had challenged for cause. One of whom, Ms. Highland, had actually worked for the defense firm of Reed Armstrong in Hendersonville. Well, in- you know, I'm assuming all you're saying is correct. Sure. Following up what Justice Stewart said, let's assume that you've allocated among defendants a number. You're saying it's okay for them to kind of share and swap, but not for a plaintiff and a defendant. Absolutely. Okay. Because of the violating of the statute. Each side of the case should get the same number required by the statute, but you can't train them across the V to the plaintiff's side. That violates the equalization statute flat out. So you can't do that. It's not permitted under the statute. It's not permitted under the rules. It's not permitted under the case law. And that's been true for 75 years. So if you do that, you violate the statute. It can't be done. All right? So it's impermissible. All right? So we know it was done. And then this issue about, well, we really didn't quite have a deal, or that's what they were able to work to believe. If John Wendler and Michael Locke are striking defense-minded jurors, which they all agreed that they were, because otherwise why would they take them off? If they're striking these jurors at the time they do and they don't have a deal, if they don't have a deal, they've just created a plaintiff-oriented jury. And then if they don't have a deal, they violate their fiduciary duty to the court. When this all came up, couldn't the court have, in effect, realigned the parties and reallocated peremptories if it was obvious that there's nothing in the statute to suggest that a realignment of parties is appropriate simply because there's a settlement to sell peremptory challenges? Okay? There's nothing that it doesn't apply to that. Well, I mean, let's, you know, settlement, no settlement. It became obvious that the two of the defendants were working with the plaintiff in jury selection. Well, I understand, but for whatever reason, when that became obvious, could you have said, Judge, you know, you need to realign the parties and reallocate peremptory challenges because this isn't fair how they're aligned now? No, because here's the point. There's nothing that allows that to happen. So let's say you take these two parties and put them on the other side, okay? If you were to do that, there's no basis for realigning parties unless there's issues in the case. There's some precedent for issues in the case. But simply because a party settles with the plaintiff and then wants to transfer peremptory challenges to the plaintiff, if you take those two defendants and you put it on the other side, okay, two defendants will settle. The point is they settled. They should be gone. Don't you have to prove that they settled, or have you done that? Well, the question is, do we have to prove that they settled? It's clear from this record that there was an agreement to use peremptory challenges. They don't deny that. They don't deny that there was an agreement to use their peremptory challenges, which violates the statute. I think what their argument is, I can't really anticipate what it is other than the briefs and other than the exhibits that the plaintiffs have suggested they're going to show the courts. What they want to talk about is, well, what did the defendants do? Did they do enough to expose this? Well, the judge has already said, I'm not interested in that. It has said another point. This is done all the time. It's done all the time with defendants, not plaintiffs. I've seen this before. Never seen it before. All right? So the point is that if you take these defendants and you put them with the plaintiffs, which there's no basis for doing that. There's no basis in the law to do that. If you do that, what would you do? You'd take two from the defense side. They've already settled the case. You can finish your thought. You'd take two from the defense side, put it on the plaintiff's side. They've already settled. They shouldn't even be in the case anymore. And then what you would do is you would be giving the plaintiff seven, seven peremptories and seven on the other side. With those two defendants out of the case, there should have been six on each side. So the plaintiffs, in even doing this deal, still would not be in the case. Every extra, phony, non-real defendant you have on, let's say, on the defense side of the case would give the plaintiff two peremptories, one for themselves and the one they got. Okay. Mr. McDonnell, you'll have the opportunity to follow up briefly in your rebuttal. Thank you, Your Honor. Mr. Scott. Thank you, Your Honor. And please support the counsel. My name is Russell Scott. I appear here today on behalf of the Defendant Appellant Emos Franchising Incorporated. I agree with Mr. McDonnell that there are several points of error in our briefs that would require reversal. And I agree with him on the argument that he made. It affects my client as well as his. Also, I would point out that neither Mr. McDonnell nor I were involved in the trial of this case. We have come to this later. Both of our defendants were defended by a single lawyer or a single law firm in the trial. Emos Franchising Incorporated is a franchiser. It franchises 94 Emos pizza establishments individually owned and operated by the franchisees. What happened in this case is that the plaintiffs very artfully interspersed Emos and Bethalco Pizza, who was the franchisee, throughout this case. But as the court looks at this record, it is critical, regardless of who they are calling the defendant at the time, that there are some facts that are really not in dispute. Emos did not injure Mr. Franchising. It did not operate the vehicle which came into contact with him, where the accident occurred, or direct his route. It did not employ Mr. Lierman, the driver, nor did it approve or vet his employment, nor did it have anything to do with the selection of Mr. Lierman as an employee of Bethalco. Emos did not inspect or approve the vehicle he was driving. Emos did not bake the pizza Mr. Lierman was delivering, nor did it decide whether to have that pizza delivered to the customer for which it was intended. Nor did it know that any of these things were occurring. Yet the plaintiff's counsel, throughout, interspersed Emos and Bethalco, essentially convincing the jury that Emos was responsible. It is Emos' position that it never should have gotten to that point, either through the motion to dismiss or the motion for summary judgment. Emos should not have been in this trial. The plaintiff essentially argues that Emos had a duty to Mr. Franchising, and now quotes the Simpkins case, as flowing as a reasonably and probable consequence of an act. The plaintiff claims Emos acted essentially in five ways. First, that we required Bethalco Pizza to engage in pizza delivery. This, of course, Emos did. Pizza delivery is fundamental to Emos' business model. It is essential to the purpose of the franchise. But the requirement of delivery alone is not an act that could be the basis for the foreseeability of Mr. Franchising. No case has been cited for that principle. The mere act of putting a pizza into a motor vehicle and driving it on public roads, it's an act performed millions of times every day, whether it's pizza, Chinese food, medicine, children, passengers, newspapers. It is so ordinary that it alone cannot make an injury during such a trip enough to transfer liability from one negligently driving such a vehicle or its employer to another without any knowledge or vicarious liability for such a driver. The second thing they claim is that Emos established an unusually large delivery area. Well, the evidence was that the delivery area was a three-quarter mile radius from the store. This is a protected area. In that area, no other Emos franchise could deliver. The franchisee, if it wanted, could deliver beyond that area as long as it didn't interfere with the protected delivery area of another franchise. In this case, Bethalto, on its own, without Emos knowledge, elected to deliver outside the area. The accident happened there not because of the designated delivery area, but because Bethalto chose, on its own, to deliver to the customer for whom the pizza was intended. The third act that is being alleged is that because Emos required, quote, timely delivery, that created a risk of harm. Plaintiff latches on to the words timely and as soon as possible in Emos' manual for this, although nowhere are these terms defined in time limits. This is not a 30 minutes or its free case. Nor, as they like to cite in the additional authority of the Jimmy Jones case, is not a freaking fast delivery case. But the manual in several places outlined in our briefs stress safety, not speed, not even time limits. The safety of the driver and others is of primary concern and that driver will not jeopardize his or her safety or the safety of others for any reason. That's in the manual. And the timely language that they have hooked on to is actually followed by the phrase taking all safety precautions and obeying all laws. Also in capital letters in the manual, it says, keep in mind that your primary objective is your safety and the safety of others. Don't ever put anything ahead of safety. And the manual does have a required clause, as opposed to suggested, that says you must never advertise or stipulate to drivers that a delivery must be accomplished within a specific time of when an order is received. So, in reality, there is no requirement here that the delivery be in such a timely manner as to avoid safety. They also allege that EMOS required Bethalto to have the driver sign a contract stating that he could be terminated for failing to deliver pizzas expeditiously. The actual language of the Bethalto agreement, the sample agreement, which it provided to Bethalto, says with safety and expedition. Safety is used many more times than anything related to time. And the evidence is clear that it was strictly Bethalto who was responsible for all aspects of hiring, training, supervising, equipping, and sending drivers out. The last claim they make in this regard is that EMOS somehow created a financial incentive for young drivers to drive at unsafe speeds. EMOS created no financial system. It provided, again, suggested manners in which Bethalto and its other 93 franchisees could compensate their employees, including the one that plaintiff now says apparently is ideal, which is to give them an hourly wage. Bethalto, not EMOS, chose how to compensate Mr. Laramie. The only thing EMOS required of Bethalto is that they pay at least minimum wage. And the owner of Bethalto testified that if the driver, through tips and delivery fees, which was the compensation method that Bethalto had chosen, did not make minimum wage, that she would make up the difference. Thus, the statements in the plaintiff's brief that paying young drivers to go fast creates a foreseeable risk of harm may be true in the abstract, but it's not supported in this case in the evidence. And the statement that EMOS established a system that rewarded young drivers for dangerous behavior is neither true nor supported. EMOS had no knowledge that Mr. Laramie would act in a negligent or unreasonable manner, and thus no knowledge that there would be any unreasonable or foreseeable likelihood of an injury outside of normal highway usage. Nor in any way did EMOS contribute to Mr. Laramie's behavior. You know, the negligence analysis on making one liable for... Thank you. In any event, we do not believe, Your Honor, that there's any basis here for direct negligence, nor, as we pointed out in the brief, do we believe there's any basis for vicarious liability. Thank you. Thank you, Mr. Scott, for your argument. Mr. Dripps? You didn't need to dim the lights or anything. It's real easy to see this for us. We tried to make it bright. May it please the Court, I'm Roy Dripps, and I represent the athlete Matthew Grumshin. I'm here with my partners Chuck Armbruster and Michael Bluecoat. When a customer calls, it is important that they get a made-to-order pizza as soon as possible. Mr. Scott's just tried to tell you that it's different than 30 minutes or less, and it's different than freaky fast. That was a jury question that was resolved against Mr. Scott's client. That's in Exhibit 27, the EMOS manual. It's on page 14. That is the theme that EMOS established throughout this case. In this case, the delivery driver, Lyerla, was complying with that directive. He was flying down the road, speeding. There's no dispute about that. He lost control of the vehicle, crossed the center line, and collided with the van in which the plaintiff was a backseat passenger. Caused permanent brain damage, including a seizure disorder, all kinds of problems. And in their brief, they have the temerity to suggest that Mr. Grumshin, the backseat passenger, was in the best position to prevent this accident. That's ludicrous. I want to start by addressing the claims of error concerning the trial procedure that Mr. McDonald brought up. I'll move on to EMOS claims of error regarding the jury's liability findings. I don't expect to address the issues concerning evidentiary errors and remitted errors unless there are questions, but I'm more than happy to address those issues. I think it's interesting that Mr. McDonald told you he knows what happened when he wasn't there, Mr. Scott wasn't there, I was there. I was the one who said, we're not talking anymore before trial. We broke off negotiations. That was it. In the record, you will see where Mr. Craney, counsel for EMOS and Bethalta, said one of these people doesn't even have insurance. Yeah, there were a number of problems going on in negotiations. Let's go to slide two. What they say here, this is their brief, is not that objectionable jurors were impaneled, but that jurors who might have been pro-defense were kicked off. The law in this state for over 120 years has been, you do not have the right to have a particular veneer person seated. All you have is the right to have objectionable jurors removed. That goes back to spies versus people, the Haymarket Riot cases in 1882, and it's been followed consistently for 120 years. And they wanted to turn that on its head. Now, one of the things that I do want to tell you, that we didn't discuss too much in the brief, but the record of the challenges for cause in this case begins in volume one at page 216. It goes through page 226. The defendant's challenges for cause begin at page 222. The trial court granted every one of the defendant's challenges for cause. Every one. At page 224, counsel for both appellants states on the record, I don't think I see any more challenges for cause for us judges. Thus, every objectionable juror that was identified by the appellants was removed for cause by the trial court, and defendants affirmatively stated there were no others. Let's go to slide three. There was no subterfuge, no secret deal. They make these wild accusations about unethical conduct. Everything was put on the record. It was put on the record for a reason. If they wanted to argue about it, if they wanted to object, they could do it. They could ask questions. Mr. Winograd, this is before the lawyer starts. It's at page 10 of the first volume of the transcript. We don't even have jurors anymore. He says, I may have strife with people I normally would. I may need to work in concord with the plaintiff if I have to. There was no objection. Nobody asked for more information. Nobody asked for reallocation of statutory challenges. The only thing counsel for appellants stated was he would object later if any defendants were dismissed after jury selection. That was it. And Mr. Winograd concluded by saying, I'm just putting everybody on notice. Despite being put on notice, on the record, in open court, defendants claim there was a secret deal, and that's nonsense. Bethalto admits, and Mr. McDonald candidly admitted, that the trial court complied with the controlling statute and allocated challenges appropriately to each side. What they ignore is the fact that both Emos and Bethalto had filed cross-claims against Metro East, Young, and Laerdal. Let's go to slide four. That made them adverse. Now, this is Mr. Winograd again, representing Metro East. What he says is, everything done here was for the purpose of defending our client. What Mr. McDonald would have him do is do everything for the purpose of defending someone else's client. The defense lawyers on the other side had individual clients that they had a duty to represent. And Mr. Winograd's great pained to say that, and that they were doing that to defend their clients. One of the things that Mr. McDonald apparently is arguing is that a party does not have the right to use for every challenges in any manner that they see fit. It's been clear for years that the only thing that you cannot do is challenge a juror because of race. There is nothing wrong when Bethalto and Emos are suing your client for you just fight back by getting pro plaintiff jurors or getting rid of pro defense jurors or anything else. There is nothing improper about that and it doesn't violate the statute. Let's go to slide 5. So there is no error. There was no statutory violation. The only thing he said was, I'm moving for a mistrial. And they say, oh, that's the only thing they could have done that could have rectified this. And this is where their argument really falls apart. All they had to do was tell the court, look, we think that the other defendant should be allocated as plaintiffs or somebody should be counted toward the plaintiff or you need to give us more strikes. And the Spies case specifically says the circuit court has the authority to bring more peremptory challenges. They didn't ask for that. The jurors, the veneer, were waiting outside the court. They were not in the courtroom when they were doing the strikes. So we didn't need to have a new jury panel. We didn't need to have a new trial. All they needed was another sheet of paper. But they didn't ask for that. They never asked for any less drastic remedy than for a mistrial. And the problem with that argument that Mr. McDonald is advancing is that if you don't ask for specific relief and allow the trial court an opportunity to correct any potential error, then any time you make a generic motion for mistrial, you can raise every objection that could have been raised in the appellate court for the first time and make this court the court of initial decision on every trial issue that comes up. That's not how it's supposed to work. In an effort to get around the fact that the trial counsel did not do anything other than ask for a mistrial, let's go to slide 6. Even after the judge said, what do you suggest? And he says, I'm preserving my right. I'm sure we're going to end up on appeal. I just want to make sure. I don't think the settlement is in good faith. If they had settled for $20,000 just before jury, but I think that, then he says, I don't think it's a good faith settlement and I'm objecting to it. That's all he said. He could have said, I think we need to start jury selection over because there is an inequity in the allocation of stripes. He could have said anything. But that's all he said. That would have in effect been granting a mistrial, right? Right. All he had to do was say, I think we need to get our pieces of paper back out, start over on striking these people, and count the ones that Metro East and Yelton are using for plaintiff, or whatever. Did the plaintiff get 12 and the two defendants got 4? Plaintiff had 8. Right, but I mean... And the defendants as a group had 8. But with the two defendants there, does that actually give the two plaintiffs 12? No, I don't think it does, Justice Sponger. And the reason is, those people were being sued by Methotel and Emos. So they had a right to confer with us, just as they had a right to confer with the defendants. There's nothing improper about that. And that doesn't convert them into plaintiff strikes, just because we made suggestions. You know, what they're trying to say is that they were no longer defendants. They were, in fact, defendants. Which gives the plaintiff 12, right? I don't see it that way, Your Honor. If Methotel had asked us for advice about a particular juror, and we told them, that wouldn't have made our juror our strike. And if they thought that, when the judge said, what do you suggest? They should have said, you need to reallocate under the statute. If that's what they believed. Now, what's even more incredible is their position that the burden to rectify this issue was not Methotel's. I find that astonishing. I always thought if something happened at trial that you didn't like, you had the burden to object, request specific relief, and get a ruling. What they're trying to do is dump this onto the trial judge, who's got a million things going on at the time. He's trying to take care of jurors. He's got other issues that may come up. It's a very hectic time for him. And now they're saying that we should have some sort of wholesale importation of the plain error doctrine into civil cases to cover them when they don't object. Well, that's not the way it works. The way it works is we have a waiver doctrine. If you don't make the objection, you don't ask for relief, you give up the point. So, in summary on that issue, there's no prejudice because they didn't have the right to have a juror sit. All of the objectionable jurors they identified were removed from clause, and they said there weren't any other. They also said each panel was acceptable. So, with that, I don't see how, even if there is some error, it's prejudicial and preserved. I take it Bothalto and Emos used all their parameters. I believe they did. But they didn't ask for reallocation. They didn't ask for additional strikes. Okay, I want to talk a little bit about Mr. Scott's argument. First of all, the jury found that Emos was independently negligent and that its independent negligence had injured the plaintiff and was 30% of the cause of his injuries. So, it's not just a vicarious liability case. Emos' misfeasance in this case, and I'll talk about voluntary assumption in just a second, they created a delivery system that allowed young drivers to deliver pizzas for money. And the more deliveries they made, the faster they would go, the more money they made. All of that is in the record. Mr. Scott, essentially, is arguing the evidence here. That was for the jury to decide. It's not for this court to re-weigh the evidence and think that the jury's decision, although reasonable, you might have come up with a different one. That's not the role of this court, and I would respectfully submit that there is more than ample evidence to support the jury's verdict with regard to the independent negligence law. They created a financial incentive to young drivers. He said, well, we didn't really do that. They authorized and ratified the specific method of compensation. They admitted that, and it's in their manual. They acknowledged that they had, that Bethalto had to have the drivers sign a form contract written by Emos Corporate that the driver could be terminated for failing to deliver pizzas expeditiously. So their control is extending down there, all the way down to the delivery of pizzas. The operating manual required deliveries to be timely and efficient, but more important, as soon as possible. And I think that's a critical fact here. And they say it's different than Domino's, and they say it's different than Jimmy John's, but the fact is that it's exactly the same. It is a representation that speed will be used in the delivery of the pizzas. When you create a financial incentive for young drivers to drive fast, it creates a foreseeable risk of harm. And the driver, La'Erla, was speeding. He admitted he was speeding, and he admitted that he was negligent. With a $2 delivery fee and a $2 tip, he admitted he would have had to have made two deliveries within an hour to make minimum wage. And to maximize his income, he testified that he would get as many deliveries in as short a time as possible. All of that is in the record. That's at page 471 to 472. EMOS knew that financial incentive was a crucial motivating factor for employees. Its manual cautioned, if your employees have need or opportunity, they may steal. Hourly workers often have unfulfilled financial needs. That is in the EMOS manual, at page 82. So EMOS was aware that employees could act not just negligently, but even criminally, to meet financial needs. So it's ludicrous for Mr. Scott to come in here and say, we had no idea that the drivers might speed in order to deliver pizzas for more tips. I think just as important as that is Mrs. EMOS' testimony that there's no bonus for safe deliveries. The jury could justifiably have concluded that EMOS was negligent for rewarding speed and ignoring safety. With regard to the vicarious liability issue, let me talk about voluntary undertaking, first of all. What's important here is, I think, this court's decision in the Decker case, and that's in the briefs, Decker v. Dominance. In that case, this court affirmed a verdict for the plaintiff based on voluntary undertaking and found that the defendant undertook to provide a security program that would deter robbery and protect employees. What's important about that is that this court looked at the scope of the duty that was undertaken broadly. Didn't look at the specific omission and say, well, that was all you undertook to do. EMOS undertook to create a pizza delivery system. As part of that pizza delivery system, they established mandatory driver contracts, mandatory driver qualifications regarding age and driving record, and established a mechanism for enforcing compliance by monitoring the motor vehicle reports. They breached that duty when they failed to even look at Lyerla's motor vehicle reports, which would have shown that he was disqualified from delivering pizzas for them because he had had three traffic tickets in the preceding 18 months. Mrs. EMOS said, yeah, that would disqualify him, but we didn't have anybody designated to look at that. So when you set up the system, and I'm not talking about just setting up the NVR, I'm talking about the whole system. They're requiring the pizza deliveries, and they set it up so that they can monitor this, and then they don't even look, and the guy who's disqualified is the one who crosses the road because he's going too fast. With regard to the agency issues, there is so much evidence of control by EMOS in this case that I could have taken up all my time with it. They mandated everything down to how to slice a pizza. But in addition, they control everything about pizza delivery. That included hiring and firing physicians, training, safety, maintenance, wage and hour requirements, record-keeping, supervision, and discipline. The manual required them to provide delivery service in accordance with the operational standards established by EMOS. So they are exercising operational control. They required that the fault of deliver pizzas as soon as possible. They controlled the boundaries of the delivery area. He says that we didn't really set the delivery territory, but they all allowed them to deliver anywhere within their territory. That was a decision that was made by EMOS, not Bethalto. Now, they also had the right to terminate drivers who did not deliver pizzas expeditiously and reserved the right to terminate the franchise if the franchisee failed to comply with these mandatory obligations. EMOS was free to argue at trial that these were only suggestions. They didn't mean what they said. But that was for the jury, and the jury rejected their argument. So for those reasons, I would ask that you affirm the judgment of the Circuit Court of Madison. Thank you, Mr. Dripps. Mr. McDonald, you have five minutes for public comment. I just sat there for 20 minutes. I sat there for the last 20 minutes waiting to hear one sentence. We did not have a deal for... But you can't prove that here. And why didn't you attempt to prove it at trial? Let's talk about that. And not you, but someone. Okay, let's talk about this. They had a deal. There's no question they had a deal. They haven't denied it. They've tried to look at other issues, but they haven't denied it. The question is, is can you sell perentory challenges? As part of a settlement, can you use somebody else who's a defendant in a plaintiff's use case? Can you do that? And if you have that, what they're suggesting is that, well, it was up to Mr. Craney to do something else to ferret that out. What could he have done? Well, I think right there it says I don't think the settlement is made in good faith. I mean, how are we to determine whether or not there was some good-faith settlement made and a deal to sell challenges? It's from the record. From the record, it's clear. You can tell that Mr. Wendler suggests he's using him for the plaintiff. He doesn't make that disclosure if he's doing it to defend his client other than for that purpose. Well, he's obviously not aligned with you two as defendants, and wouldn't necessarily be if he's being sued. But then why does Mr. Wendler make that statement at the beginning to announce to the court that I'm doing something to defend my client I wouldn't do otherwise, and I may be taking challenges I wouldn't otherwise make? Why does he make that? Because he truly has a position legitimate in the case. Well, in that same statement, though, doesn't he say, and I'm going to do this to try to get my client out of the case? Yeah, you know what that means? That means I have a settlement. There's a promise here. I will let you out if you use the peremptory challenges that I tell you to use. That is a settlement. But maybe that should have been put on the record. They should have put it on the record. It's an illegal deal. You can't do that. That deal doesn't work. You cannot sell and trade peremptory challenges from one side on a defendant to the plaintiff. You can't do it. Therefore, the burden was on them to disclose that fully to the court. If they had, those two parties would have been dismissed from the case before the peremptories were used. Well, at the time of the good faith settlement, the next day or whatever that was, why wouldn't whoever was representing Bethalto at that time, why would he not have, at that point in time, fleshed this out? He says it's not good faith, and this is why. Let me finish. Why would he not have forced questioning of plaintiff's counsel or whatever, put them on the stand, done whatever to prove that there was a deal, so that the burden... If you make an illegal deal, it's an unlawful deal because of the equalization statute. It's an unlawful deal. The burden was on them to disclose it. He did everything he could do but stand on his end. The judge said, it's done all the time. Another place, he says, I'm not interested in that. Okay? What else could he do? And the point was, they also point, there's no prejudice because you can't point to a juror who is on the panel. No. The point is, the jurors were gone. They used 12 when he kicked off the defense-minded jury. They're all gone. But your whole theory is raises and falls on some illegal deal because you aren't entitled to a perfect defense jury. You're just entitled to a fair jury and a non-objectionable jury. So don't you have to show that there was some crooked deal going on and you can't come here and convince us. The point is, do we have to show the proof? We can show and have shown that they were using the defense challenges and that Mr. Wendler was not using them for any purpose for his client. And we can show on the record. The point is, wouldn't they deny it? Wouldn't they deny it if they didn't have a deal before? They actually suggested to the court they didn't have any such deal at the end of the day after all the jurors had been selected. So we're going to talk about that in a minute. They were suggesting to the court they didn't have a deal but they had a deal. In fact, they had to have had a deal at the time. And John Wendler raised that issue. Now, what else did Mr. Craney do? The point is, is that the defense jurors, minded jurors, even conceded by the plaintiffs because they had made challenges for cause for two of them and then told Mr. Wendler who he'd kick off. So they used 12. Those are wrong. If this were a race case and they kicked off all the African-Americans and then turned around and said, well, have your pick of the other whites those jurors are gone. And that's what makes it prejudicial. Those jurors are gone. They don't have an opportunity to do that. And so the equalization schedule is going to turn around and say, you know what's interesting? 75 years ago the court had already figured this out because what you would do as a plaintiff is have a deal, not tell anyone, put in two extra defendants to do the straw parties. That's what you do. And then you get two picks for every one of them who are straw parties. You haven't disclosed it to anyone. And then after the case you dismiss it. All right? The court, just let me briefly, if I may. Just a minute here. Just a minute. I can do this in a minute. Schultz v. Gilbert, Fourth District, 1939. A case may well be imagined in which an unscrupulous plaintiff joins a number of phony plaintiffs for the sake of increasing his power to select the jury he wants by use of his extra-parentry challenges. And then, when that end has been accomplished, withdraw such fraudulent plaintiffs. This would be a fraud upon the defendant and the court. They've already figured this out. Okay. Thank you, Mr. McDonald, for your arguments and thank you all for your briefs and we will take them after advisement.